1  Loops.  But usually he'll want pasta in the morning.

2  I don't know, but that's been his thing lately.

3      Q    And when he comes home, does he have a

4  snack?

5      A    Yes, he does.  He loves grapes and graham

6  crackers.  He really likes these chocolate bunny

7  things from Whole Foods.

8      Q    Thank you.

9          MS. ROBB:  I have no further questions.

10         THE COURT:  Any redirect?

11         MR. POE:  Very briefly, Your Honor.

12                REDIRECT EXAMINATION

13         BY MR. POE:

14     Q    With respect to the Dr. Rainey

15  appointments since the January show cause hearing,

16  were any of those -- you said that you missed one,

17  was that rescheduled?

18     A    Yes.

19     Q    So that appointment took place, just at a

20  different time than --

21     A    Yes.

22     Q    And on any of the times that you were late

23  bringing Mason to Dr. Rainey's office, was there any

1   issue with Mr. Clark?

2       A    Unfortunately, his car was parked right in

3   front of the entrance.  And we're not supposed to be

4   there at the same time for many reasons.  Quite

5   frankly, it threw me off, and we were like, what, 5

6   minutes late or something.

7           But I sent an e-mail and asked him not to

8   be there when I'm there.  That was the whole point,

9   that we shouldn't -- It makes me, honestly, too

10  nervous.  I don't know what's going to be said to

11  me.  You know, I don't know.

12      Q    You mentioned the migraines and the neck

13  pain that you said were a problem.

14      A    Uh-huh.

15      Q    Did you suffer from those before May 25th,

16  2014?

17      A    Yes.  Recently I found out that only 2% of

18  the dentists in America are neuromuscular dentist.

19  I have a neuromuscular dentist.  I mean, a lot of

20  these things are due to the fact that I have an

21  abnormality in my -- the left side of my jaw is not

22  the same as my right.  So there's a lot of straining

23  of musculature that causes -- So I'm working with

1  him on -- I'm going to need braces, but we'll wait

2  until after I can afford them.

3      Q    Okay.  With respect to the migraines, has

4  there been any change with respect to the frequency

5  that you suffer from these?

6      A    This has been like a nightmare-ish time, I

7  guess.  It has been very -- I can only think of one

8  other time in my life that might have been worse.

9      Q    And you mentioned that with respect to the

10 health insurance changing, it was a couple of days

11 before you could, first, fill Mason's prescription;

12 right?

13     A    Right.  And I got rejected two other

14 times, too.

15     Q    Right.  So your own personal

16 prescriptions, how long before you could fill those?

17     A    A couple of days.

18     Q    A couple of days.

19          MR. POE:  Nothing further, Your Honor.

20          THE COURT:  All right.  You may step down.

21          THE WITNESS:  Oh, I'm sorry.

22          THE COURT:  All right.  What's remaining?

23          MR. HISS:  Your Honor, I have a request.  I

1  spoke with the guardian ad litem and Mr. Poe, and I

2  don't believe there's any objection.  My expert

3  that's going to testify as to Mrs. Clark's ability

4  to earn money and her earning capacity, is here.  I

5  thought she was going to be here -- I thought we

6  would be done this morning; my mistake.

7       She has a broken foot.  And she needs to

8  get back down to her therapist to get the foot

9  worked on.  She asked me if there is any chance that

10 she -- and I was unaware of this -- could testify

11 out of order.

12      Mr. Poe has no objection, I believe, and

13 Ms. Robb has no objection.  I'd like to call her

14 now.  It's a 20 minute exam from soup to nuts.

15      THE COURT:  20 minutes in total or 20

16 minutes for direct?

17      MR. HISS:  My direct will probably be 10

18 minutes.  Her qualification will be 3 to 4.

19      THE COURT:  Well, is there any issue on

20 her qualifications?

21      MR. POE:  No, Your Honor.  There is an

22 issue with calling her.  I object to her being

23 called, because proper information was not disclosed

to me pursuant to this court's scheduling order.

THE COURT:  Well, that's a different issue.

MR. POE:  Right.  I just want to clarify that I do object to calling the witness.

THE COURT:  Okay.  So what's the objection?

MR. POE:  Yes, thank you, Your Honor.

So under section 3 of the scheduling order it requests all information discoverable under Rule 4-1 (b) or (a)(1) of the Virginia Supreme Court Rules, should be provided or the expert would not ordinarily be permitted to express any non-disclosed opinions at trial.

We requested that information in our interrogatory responses.  I've received no reports. And I have not received any information about the substance of the facts and opinions and the grounds, the relevance of this person's testimony.

The only information I've received is that this person is a vocational expert, and that she wants to impute income to Mrs. Clark.

It's an unfair surprise.  I've never seen

1   a case in which an expert, a vocational expert,

2   didn't submit a report to the court.  I need to know

3   the basis on which she's going to express her

4   opinions.  And, frankly, I was prejudiced by not

5   having that information.

6           THE COURT:  Do you have a copy of your

7   discovery request?

8           MR. POE:  Yes, I do.

9           THE COURT:  Let me see it.  For the

10  record, which request is it?

11          MR. POE:  It's number 28.

12          THE COURT:  Interrogatory 28?

13          MR. POE:  Yes.

14          THE COURT:  Let me see it.

15          (Whereupon, the court reads interrogatory

16  28.)

17          THE COURT:  So this tracks rule 4:1?

18          MR. POE:  Yes.

19          THE COURT:  All right.

20          MR. HISS:  The only thing we weren't able

21  to provide, Your Honor, was a report.  We would have

22  supplied a written report had we got one.  I don't

23  have one.  Mr. Poe doesn't have one.  The guardian

106

1    ad litem doesn't have one.

2           The reason for that is the deposition was

3    held about two and a half weeks ago.  The court

4    reporter knows the exact date.  The expert had asked

5    me to ask specific questions.  She sent me a long

6    litany of questions to ask during the deposition.

7           THE COURT:  You took your own expert's

8    deposition?

9           MR. HISS:  My deposition.

10          THE COURT:  You took your own expert's

11   deposition?

12          MR. HISS:  No, no, no.  The deposition of

13   Mrs. Clark.

14          THE COURT:  Oh, I see.

15          MR. HISS:  And she needed to --

16          THE COURT:  Okay.  She needed information.

17          MR. HISS:  From that deposition.

18          THE COURT:  Okay.

19          MR. HISS:  I'm not going to say anything

20   other than, due to scheduling, we could not schedule

21   it any earlier than when we did.

22          THE COURT:  So is your expert going to

23   testify as to facts?

1    MR. HISS:  All she's going to testify to

2  is Mrs. Clark's resume, her expertise, and the two

3  fields of work Mrs. Clark can get employment in.

4  The one field she feels she can get employment in

5  immediately, and the one field she feels she can get

6  employment in, let's say, within a year.  That's the

7  extent of it.  And, of course, the money.

8    THE COURT:  So what are your expert's

9  opinions?  What are the opinions she's going to

10  testify to?

11    MR. HISS:  Do you want me to say it right

12  now?

13    THE COURT:  Yes, what are the opinions?

14    MR. HISS:  Her opinion is going to be that

15  Mrs. Clark can become a paralegal in short order,

16  making about $60,000 a year in the metropolitan

17  area.  And within a year, she can probably get a job

18  as a lawyer making about $90,000 a year.

19    Those are both entry levels, even though

20  she has an extensive resume.  These are entry level

21  positions, given she has been out of work and hasn't

22  been working with a firm for some period of time.

23  But she has been a clerk for two judges; that's hard

108

1    to come by, and that helps her resume.

2           THE COURT:  And any of these opinions

3    you've just related, have they been put to paper and

4    sent to opposing counsel?

5           MR. HISS:  No.

6           THE COURT:  All right.  The objection is

7    sustained.

8           MR. POE:  Thank you, Your Honor.

9           THE COURT:  All right.  Where does that

10   leave us now?

11          MR. HISS:  I would call probably one

12   impeachment witness, and I'd probably -- just one

13   impeachment witness for Mrs. Clark.

14          THE COURT:  Okay.

15          MR. HISS:  And that witness is also going

16   to testify in the ED part of it.

17          THE COURT:  About what?

18          MR. HISS:  Money that Mr. Clark received.

19          THE COURT:  In relation to the house; is

20   that what it is?

21          MR. HISS:  Yes, because --

22          THE COURT:  Brandenburg?

23          MR. HISS:  Yes, she provided funds to keep

109

1   the house current.

2         THE COURT:  I see.  All right.

3         And are you done with your case?

4         MR. POE:  I'm done with custody.  But I

5   still have ED and support.

6         THE COURT:  Okay.  All right.  And how

7   many witnesses do you have?

8         MR. POE:  Just the parties, Your Honor.

9         THE COURT:  All right.  So we'll take a 30

10  minute lunch, and we'll wrap up by 3:00 o'clock, I

11  think.  We'll do it all in about an hour and a half,

12  an hour and 45 minutes?

13        MR. HISS:  There's a lot of documents and

14  a lot of argument on the house, Your Honor.

15        THE COURT:  All right.  Well, are the

16  documents stipulated to?

17        MR. HISS:  No.

18        THE COURT:  Okay.  Well, then that's what

19  you can do over the next 30 minutes.

20        MR. HISS:  Well, we've showed the

21  documents to Mr. Poe, and he doesn't agree with

22  them.

23        MR. POE:  There is a disagreement over

110

1   income, yes, on the documents.

2           THE COURT:  I mean, are there

3   authentication issues with the documents?

4           MR. POE:  No, I'm not disagreeing with the

5   documents he's going to submit, I'm just --

6           MR. HISS:  Now we have a stipulation.

7           THE COURT:  Well, I'll tell you what,

8   we're going to be done by quarter of 4:00.  So

9   figure out what you need to do, so you can get all

10  your evidence in that you need to get in, and we're

11  done by quarter of 4:00 with the taking of evidence.

12  Then I'll give you some time for argument.  Okay?

13          MR. HISS:  I think that's fair.

14          THE COURT:  All right.  I do too, that's

15  why I ordered it.

16          And what is this agreed upon visitation

17  schedule that you referenced earlier?

18          MS. ROBB:  The visitation schedule

19  essentially is going to be the non-custodial parent

20  will have the alternating weekends, typical

21  alternating of Thanksgiving, a division of Christmas

22  winter break, spring break, up to three weeks in the

23  summer, with only two being consecutive, and a

111

1  Wednesday overnight visit.

2  THE COURT:  Okay.

3  MS. ROBB:  The only issue in my mind is if

4  the court were to change primary physical custody

5  from Mrs. Clark to Mr. Clark, is I would ask for a

6  transition schedule to do that.  I've submitted a

7  proposal to both counsel.  I think, although there

8  is no agreement on who is going to be the primary

9  custodian, I think Mrs. Clark is amenable to my

10  proposal, but Mr. Clark is not.  And so that's kind

11  of where it is.

12  MR. HISS:  Mr. Clark is not amenable to

13  visitation or to the change of custody?

14  MS. ROBB:  To the transition that I'm

15  proposing if he were to become the primary

16  custodian.

17  MR. HISS:  That will be a very brief

18  argument, Your Honor.

19  MS. ROBB:  Because I don't think --

20  THE COURT:  All right.  Okay.  So,

21  counsel, did you meet yesterday for 30 minutes?

22  MR. POE:  Yes.

23  MR. HISS:  More than that.

1    THE COURT:  Yes?  How far did you get?

2  Did you resolve anything?

3    MR. HISS:  We found out why there was so

4  much disagreement.

5    THE COURT:  Okay.  Did you resolve

6  anything?

7    MR. POE:  I think we moved the needle.

8  The disagreement over spousal support has become a

9  lot less.  But I have not --

10    THE COURT:  Well, that may change now, so

11  why don't you also take this 30 minutes that we're

12  going to take a break and talk about spousal

13  support.

14    MR. HISS:  We took every permutation we

15  could think of and sent it to Mr. Poe.  And Mr. Poe

16  was obviously in his office very late last night.

17  He responded.  We're still pretty far apart.

18    THE COURT:  But there's not going to be

19  any testimony of imputation of income.  There's not

20  going to be any evidence of imputation of income.

21    MR. HISS:  Well, given the court's ruling

22  --

23    THE COURT:  So you probably should take

113

1   the next --

2        MR. HISS:  -- I don't have an expert.  All

3   I'm going to be able to do is ask her what she does

4   for a living and how much she thinks she can make.

5   She says she can work in her interrogatories.

6        THE COURT:  Right.  So why don't you take

7   this 30 minutes and see if you can resolve the

8   spousal support issue also.

9        So figure out how you can get this case

10   done by quarter of 4:00, and also whether or not you

11   can have further discussions on spousal support.

12   All right?  And then we'll be back her at 20 after

13   1:00.

14        (Whereupon, there was a 30 minute break in

15   the proceedings for lunch.)

16        THE COURT:  All right.  Have you resolved

17   anything?

18        MR. HISS:  No, it sure helped.  The court

19   is still going to have to make a couple of calls,

20   but we really --

21        THE COURT:  You're closer?

22        MR. HISS:  We're not going to get any

23   closer.  It's just there are a couple of things that

114

1   the court is going to have to make a call on.  And,

2   of course, that would greatly affect --

3          THE COURT:  Okay.  What are those?  What

4   are those issues?

5          MR. HISS:  The issues are going to be her

6   income --

7          THE COURT:  Okay.

8          MR. HISS:  -- and the money from the

9   house, and how it is to be divided; that's it.  And

10  I think we're supposed to argue my client's income.

11  Oh, and, of course, custody.

12         MR. POE:  And, I'm sorry, I failed to

13  mention earlier there's also a retirement account in

14  Mr. Clark's name that --

15         THE COURT:  All right.  So the property

16  issues involve Mrs. Clark's income, the division of

17  the equity of the marital home, and Mr. Clark's

18  retirement?

19         MR. HISS:  Yes.

20         THE COURT:  Is there an issue as to the

21  division of that, or just what the value is?

22         MR. HISS:  Just the percentages.  We've

23  agreed on marital debts, the credit cards, consumer

115

1   type debts, the court is just going to add a

2   percentage.

3            THE COURT:  But the retirement is not a

4   debt, it's an asset.

5            MR. HISS:  No, I understand that.

6            THE COURT:  So is it the percentage of

7   division that's at issue, or is it the amount?

8            MR. CLARK:  Excuse me, Your Honor, on the

9   amount of division --

10           THE COURT:  As to the retirement, are

11  there two issues, one the value of it, and two the

12  division of it?  Or is it simply the issue of

13  division of a value, that you've already agreed on

14  what the division should be?

15           MR. CLARK:  I have to speak with opposing

16  counsel.  I know the date of when we separated with

17  Vanguard.  I have to work with Mr. Poe, opposing

18  counsel.  With the date of 2005, we should be able

19  to figure that within five minutes; that's an easy

20  number, and I would assume we'd divide that in half.

21           THE COURT:  All right.  So the retirement

22  you can work out between the two of you?

23           MR. POE:  I believe it's 50% of what was

116

1   there on the date of separation, as long as -- I

2   haven't seen any statements yet, so I'm not able to

3   talk about --

4           MR. CLARK:  Yes.  But that's the

5   agreement.  I will show him on the computer screen.

6           THE COURT:  50%, date of separation?

7           MR. CLARK:  Correct.  From the date of the

8   marriage to the date of the separation.

9           THE COURT:  And that date is March 26th --

10  What's the date of separation?

11          MR. POE:  2014.

12          MR. CLARK:  April 19th, 2013, Your Honor.

13  And the date of the marriage was July 16th, 2005.

14          THE COURT:  April 19th, 2014 is the date

15  we're using?

16          MR. CLARK:  The date of separation is

17  April 2013.

18          THE COURT:  '13 is what I meant to say.

19  Okay.  So that's resolved.

20          All right.  So you want to provide

21  evidence as to what Mrs. Clark's income should be?

22          MR. HISS:  Your Honor, the only thing I

23  have to provide is through examination of her.

117

1          THE COURT:  Okay.

2          MR. HISS:  Her tax returns, what she made

3     when she was working.  Because, frankly, the --

4          THE COURT:  And how far apart -- I mean,

5     the two of you are going to be arguing at the end of

6     the evidence.  So what are you going to be arguing

7     as to what her income should be?

8          MR. HISS:  Mr. Poe thinks her income --

9          THE COURT:  Well, you just tell me what

10    your argument is, and Mr. Poe will tell me what his

11    argument is.

12         MR. HISS:  My argument is she should be

13    making at least that that she made as a clerk, which

14    is $55,000.  Mr. Poe thinks that she should be

15    making zero.

16         MR. POE:  She's making zero right now,

17    that's the reality.  I know that the court would

18    consider what is she possibly able to make if she

19    finds something.

20         THE COURT:  What do you think the evidence

21    is going to show she's going to be able to make?

22         MR. POE:  Close to minimum wage.

23         THE COURT:  Which is how much a year?

1        MR. POE:  I don't have that number.

2        MR. HISS:  Well, minimum wage is $24,000 a

3   year, give or take.

4        THE COURT:  You know, this is really not a

5   very complicated issue.  I find it hard to believe

6   that able counsel can't get together and come up

7   with a number as to what her income is.  I mean, I

8   hear from Mr. Hiss that it's $55,000 minimum.

9        MR. HISS:  That's a minimum.

10        THE COURT:  Okay.  And I'm hearing from

11   you zero.

12        MR. POE:  I would agree to using minimum

13   wage.

14        THE COURT:  Do you think the court's -- Do

15   you think -- I don't know what the evidence is, but

16   you're here as a representative of the court, an

17   officer of the court, you're representing to the

18   court that after I hear all of the evidence, it's

19   reasonable that the court can find her income at

20   zero; is that what you're representing to this

21   court?

22        MR. POE:  No.  I think --

23        THE COURT:  Well, then why haven't you all

119

1   tried to figure out what it is?

2           MR. POE:  We have been.

3           THE COURT:  But you're at zero.  And

4   you've just stated it's not going to be zero.

5           MR. POE:  No, Your Honor, I'm --

6           THE COURT:  So what do you think it's

7   going to be?

8           MR. POE:  I'm not negotiating just based

9   on zero.  I'm willing to negotiate --

10          THE COURT:  So what do you think it is?

11          MR. POE:  -- based on minimum wage.

12          THE COURT:  So what number do you think

13  the evidence is going to show your client's income

14  should be?

15          MR. POE:  I believe it's $19,000.  That's

16  the most she has made during the marriage.  $19,000

17  per year.

18          THE COURT:  So round it to $20,000?

19          MR. POE:  Yes.

20          THE COURT:  So you're at $55,000 and

21  you're at $20,000, and the two of you haven't been

22  able to figure it out?

23          MR. HISS:  Your Honor -- a phrase I so do

1  hate -- with all due respect, we had an expert that

2  we thought was going to give us much better numbers

3  to work with.

4          THE COURT:  Well, that ship has sailed.

5          MR. HISS:  I understand.

6          THE COURT:  So now that --

7          MR. HISS:  But I will proffer -- and I

8  don't think Mr. Poe will take exception to this --

9  that her qualifications are that she's a practicing

10  lawyer, she's got more than 5 years of experience,

11  she was a clerk for two Superior Court judges, and

12  she's licensed in D.C. and Maryland.

13          THE COURT:  And all that supports your

14  argument that at a minimum it should be $55,000; I

15  got that part.

16          MR. POE:  Your Honor, she is not working

17  currently.  She is doing her best to find a job.

18  She --

19          THE COURT:  And I'm going to hear evidence

20  of her efforts to find a job?

21          MR. POE:  Yes, in testimony, Your Honor.

22          THE COURT:  All right.  I'll decide it.

23          And the division of the equity?

121

1        MR. HISS:  We're going to present how the

2   house was acquired very quickly.

3        THE COURT:  Okay.

4        MR. HISS:  How much he paid for it, how

5   much he put into the house, the money that is owed

6   to his parents, not by a lien, but notes signed by

7   the parents --

8        THE COURT:  And signed by him?

9        MR. HISS:  -- and signed by him.  In fact,

10  he has curtailed it.  We're going to show the money

11  he has had to borrow to keep the property current.

12  There's an IRS lien of $55,000.  And his inheritance

13  of $44,000, he put into the house.

14        THE COURT:  All right.

15        MR. HISS:  And we'll wrap it up with a

16  nice bow, and give it to the court to make a

17  decision.

18        THE COURT:  All right.  Mr. Hiss, I guess

19  it's your issue, so call your first witness.

20        MR. HISS:  Excuse me?

21        THE COURT:  Call your first witness, Mr.

22  Hiss.

23        MR. HISS:  Oh, we had one last witness to

122

1  call. I want to call his sister for impeachment of

2  Mrs. Clark, which I told you I was going to do.  In

3  addition, she'll testify as to the inheritance.  If

4  the court doesn't want to hear that, that's fine.

5          THE COURT:  She's testifying to the two

6  issues:  One, the custody, and the second, the

7  marital home?

8          MR. HISS:  ED.

9          THE COURT:  Okay.  Sure.

10          MR. HISS:  Amanda Nelson.  She's Heather's

11  mother, also, which goes to the best friend, et

12  cetera, and Mason's aunt.

13  Whereupon,

14                  AMANDA NELSON

15  the witness, was called for examination by counsel

16  on behalf of the plaintiff, and, after having been

17  duly sworn by the court's clerk, was examined and

18  testified as follows:

19                DIRECT EXAMINATION

20          BY MR. HISS:

21      Q   Ma'am, would you state your name for the

22  court, please?

23      A   Amanda Nelson.

123

1    Q    And what's your relationship to Mr. Clark?

2    A    He's my brother.

3    Q    And where do you live, ma'am?

4    A    12700 Huntsman Way, Potomac, Maryland.

5    Q    What do you do for a living, ma'am?

6    A    I'm an accountant.

7    Q    Have you had occasion to visit with Mason,

8    Mr. Clark's son and your nephew?

9    A    Yes.

10   Q    Okay.  How often?

11   A    Well, it depends on when it was, but --

12   Q    Within the last six months?

13   A    Oh, the last six months?  Whenever he had

14   him.

15   Q    Okay.  Would you describe for the court

16   the most recent visit you had with Mason?  What

17   happened?  Mason's activities and what he was doing?

18   A    Okay.  That would have been like two

19   Fridays ago.  Drew had him, and he called me and

20   asked me to meet him at the house where he was

21   living.  Mason was agitated.  He wouldn't go in the

22   house.  He was running back and forth on the street.

23   It's a cul-de-sac.  But he was going back and forth

124

1   and back and forth.

2        If I approached him, he just kind of ran

3   away.  He was just going further down the street.

4   So we just kind of hang out outside for a while to

5   get him to calm down.  Then he went to the car to

6   get his iPad so he could take pictures.  Then he

7   went into the house to take pictures of stuff.

8        Q    Why was he taking pictures, ma'am, do you

9   know?  Did he tell you why he was taking pictures?

10       A    Well, he wanted to take pictures of Daddy

11   on the phone.  But Daddy wasn't on the phone.

12            THE COURT:  Who was on the phone?

13            THE WITNESS:  I'm sorry.  Mason wanted to

14   take pictures on the iPad of his dad, Drew, on the

15   phone.

16            THE COURT:  "His dad" is what you said.  I

17   couldn't hear what you just said.

18            THE WITNESS:  Yes.  I'm sorry.

19            THE COURT:  "His dad on the phone," okay.

20            BY MR. HISS:

21       Q    What else was Mason doing and what was he

22   saying?

23       A    "Where is mommy?"  You know, "Daddy is on

125

1    the phone with the lawyers."  And this is like 9:00

2    o'clock at night.  It wasn't even full sentences.

3    It was just "I -- I -- I want -- I --"  You know, it

4    was just back and forth.

5            We were like, "Okay, we'll sit on the

6    curb, and we'll see what happens here."

7        Q    Did this give you concern?

8        A    Oh, yes.

9            THE COURT:  Who was sitting on the curb

10   with you?

11           THE WITNESS:  Me.

12           THE COURT:  Just you?

13           THE WITNESS:  Yes.  It was like, "Okay --"

14           THE COURT:  Well, you said, "We were

15   sitting on the curb."

16           THE WITNESS:  Oh, well, he came and sat on

17   the curb, not next to me, for a while.

18           THE COURT:  Mason did?

19           THE WITNESS:  Mason did.  I'm sorry, yes.

20   It was the two of us.

21           BY MR. HISS:

22       Q    Okay.  And you're Heather's mom; right?

23       A    Yes, I have a daughter named Heather, yes.

126

1    Q    We've heard about Heather.

2    A    Okay.  And Peter.

3    Q    Did you attempt to contact the guardian ad

4    litem about this incident?

5    A    Not that night.  I had previously called

6    her.

7    Q    All right.  Have you seen Mason act out

8    that outlandishly in the last six months?

9    A    Nothing to that extreme.  I mean, he

10   doesn't like any hugs or, you know, he wouldn't take

11   his Christmas presents and things, but nothing where

12   he seemed just so agitated; and, I mean, he had

13   boatloads of energy.

14   Q    Have you had occasion to visit Mr. Clark's

15   home on Spring Street in the last six months?

16   A    No.

17   Q    Okay.

18        THE COURT:  What is this rebuttal to?

19        MR. HISS:  At this point it's not doing

20   what I thought it was going to do, so I'm going to

21   stop my line of questioning and I'm going to change

22   my line of questioning.

23        THE COURT:  So this is not rebuttal to