IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICHELLE RAHBAR, a/k/a Michelle Clark, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  1:18-cv-1475 (LMB/MSN) |
| | ) |
| LAW OFFICE OF ARQUILLA & POE, | ) |
| PLC, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

In April 2013, Michelle Rahbar, who at the time was known as Michelle Clark

("plaintiff"), separated from her then-husband Andrew Clark ("Clark"), and the two began an

acrimonious divorce process. Plaintiff engaged the Law Office of Arquilla & Associates, PLC

(the "Law Office")[1] and its attorney Michael L. Poe ("Poe") to represent her in the divorce

proceedings. Those proceedings culminated in a consent order and final divorce decree entered

in July and December of 2015, respectively. In November 2018, plaintiff, acting pro se,[2] filed

this civil action against the Law Office and Poe (together, "defendants"), alleging that in the

course of those divorce proceedings, defendants committed legal malpractice and a host of other

state-law torts.

---

[1] The firm's name has since been changed to the Law Office of Arquilla & Poe, PLC. Defs.'
Memo. in Supp. of Mot. to Dismiss [Dkt. No. 10] 2-3.

[2] Although plaintiff is an attorney, she has "only ever practiced part-time transactional law . . .
and participated in pro bono programs . . . and community based low income clinics," and has
not practiced in several years. First Am. Pro Se Pl.'s Memo. in Opp'n to Defs.' Mot. to Dismiss
[Dkt. No. 25] 7. Moreover, she has recently been diagnosed with serious health conditions that
affect her "physical and mental abilities." Id. at 7-8. As such, the Court will afford her
pleadings and memoranda the "liberal[]" treatment given to all documents filed by pro se
litigants. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).

Before the Court is defendants' motion to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants' motion has been fully briefed[3] and is ripe for decision.[4] For the reasons stated below, the motion will be granted in part and denied in part.

## I. BACKGROUND

### A. **Factual Background**[5]

Plaintiff and Clark were married in 2005. Defs.' Memo. in Supp. of Mot. to Dismiss ("Defs.' Memo.") Ex. B [Dkt. No. 10-2] 2. The following year, they had a son, M.F.C.[6] Id. The family lived together in a Falls Church, Virginia home of which Clark was the sole owner before the marriage. Plaintiff alleges that her husband gave her a one-half interest in that property in 2008 through a deed of gift. Compl. for Civil Case ("Compl.") Ex. II [Dkt. No. 1-2] 14-15.

---

[3] On March 20, 2019, plaintiff filed a sur-reply styled as a "Request to Respond to Defendant[s'] Brief in Support of Their Motion to Dismiss" [Dkt. No. 28]. As previously explained to plaintiff [Dkt. No. 16], leave to file a sur-reply typically is not granted unless necessary to aid the decisional process; however, because plaintiff's memorandum meaningfully responds to an argument articulated only in defendants' reply, the Court finds good cause to grant plaintiff leave to file the sur-reply.

[4] Plaintiff has advised that due to her fibromuscular dysplasia and the side effects she is experiencing from her medication, she may have difficulty responding to questions or pressing her arguments during live hearings. Accordingly, on February 1, 2019, the Court issued an order stating that defendants' motion to dismiss would be resolved based on the parties' written submissions. The Court is satisfied that the parties' memoranda address all relevant issues and that oral argument would not produce a different result.

[5] The following facts are drawn from plaintiff's complaint, including the exhibits attached thereto, as well as from documents submitted by the parties that were either "explicitly incorporated into the complaint by reference" or "integral to the complaint . . . [with] no dispute about [their] authenticity." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016). Although a Rule 12(b)(6) motion "tests the sufficiency of a complaint," the Court may consider this universe of documents without converting the motion into one for summary judgment. Id. at 165 (quoting Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013)).

[6] Consistent with Rule 5.2(a) of the Federal Rules of Civil Procedure, the couple's son is identified only by his initials, M.F.C.

Although plaintiff occasionally took on part-time work, she mostly stayed at home and cared for their son, M.F.C. Compl. 3.

The couple separated in April 2013. Defs.' Memo. Ex. A [Dkt. No. 10-1] 116. On September 22, 2014, plaintiff entered into a retainer agreement with the Law Office "to represent [her] . . . [in securing] a divorce and during the court proceedings that follow." Compl. Ex. I [Dkt. No. 1-1] art. 1. The retainer agreement provides that any dispute as to the "validity, interpretation, and execution" of the agreement would be governed by Virginia law. Id. art. 16.[7]

A multiple-day trial to determine issues related to the couple's divorce was held beginning on July 8, 2015 before the Honorable Judge Fiore of the Circuit Court of Arlington County, Virginia. See Compl. 3. Several matters were at issue, the first involving custody of M.F.C. Custody and visitation issues had been hotly contested since at least January 2015, when Clark moved for an order to show cause based on his claim that plaintiff—who under the terms of an order pendente lite had primary physical custody of M.F.C.—was failing to deliver the child into his custody during agreed visitation hours. See Defs.' Memo. Ex. A [Dkt. No. 10-1] 79-80, 83-85. At a previous hearing on that motion, Clark had presented a video recording he claimed showed that plaintiff "was keeping [M.F.C.] from his father." Compl. 9. Plaintiff argued that M.F.C. had engaged in "emotional outbursts and efforts to harm himself" due to distress ahead of scheduled visitation times with his father. Although plaintiff had taken videos of those outbursts, she claims that Poe opted not to play those videos at the show cause hearing

---

[7] The retainer agreement also provides that "any legal action to enforce or contest issues in [the a]greement shall be brought in the Circuit and General District Court of Fairfax County, Virginia." Compl. Ex. I [Dkt. No. 1-1] art. 16. Defendants have not moved to dismiss on the basis of this clause and thus may have impliedly waived their right to assert it. See Bartels ex rel. Bartels v. Saber Healthcare Grp., LLC, 880 F.3d 668, 678-97 (4th Cir. 2018); Kettler Int'l, Inc. v. Starbucks Corp., 55 F. Supp. 3d 839, 849-50 (E.D. Va. 2014).

3

and that as a result, the court found her to be in violation of the pendente lite order and ordered

her to undergo a psychiatric evaluation. See First Am. Pro Se Pl.'s Memo. in Opp'n to Defs.'

Mot. to Dismiss ("Pl.'s Opp'n") Ex. 4 [Dkt. No. 25-4].

The custody issue occupied most of the second day of the trial (July 9, 2015). Plaintiff

gave extended testimony about her relationship with the couple's son, her views on Clark's

relationship with the child, and developmental challenges the child was facing.[8] See Defs.'

Memo. Ex. A [Dkt. No. 10-1] 5-102. The judge heard testimony from both parents and heard

argument from the guardian ad litem, who recommended that primary physical custody be

transitioned from plaintiff to Clark. See id. at 111, 209; see also id. at 218 ("[I]f the court were

inclined to [address] custody . . . right now, . . . I would certainly have to say that Mr. Clark

shows more stability."). After considering the parties' testimony, as well as the report prepared

by the guardian ad litem and the mental health evaluation prepared by plaintiff's long-time

psychiatrist,[9] the court ordered that Clark and plaintiff would have joint legal custody of M.F.C.

but that Clark would have physical custody of the child, with plaintiff having only limited

visitation rights. Id. at 222-30; see also Pl.'s Opp'n Ex. 5 [Dkt. No. 25-5] (setting out the final

terms with respect to custody and visitation). The court gave several reasons for this ruling,

---

[8] At trial, plaintiff testified that M.F.C. has a "phonological processing deficit" that has delayed his progress in areas like reading and writing. Defs.' Memo. Ex. A [Dkt. No. 10-1] 11. There were also suggestions at trial that M.F.C. suffers from attention deficit disorder and has difficulty with social skills. See id. at 16-17, 28-29.

[9] Plaintiff alleges that psychiatric evaluations were not covered by her medical insurance; that cost estimates for such an evaluation varied greatly depending on "what tests the Court wanted conducted"; and that Poe refused to ask the court for clarification as to the required content of the evaluation and similarly refused to petition the court to appoint an evaluator at taxpayer expense. Id. at 10-12. In the end, plaintiff submitted an evaluation prepared by Dr. Khalil, her longtime psychiatrist, see Defs.' Memo. Ex. A [Dkt. No. 10-1] 79-80; however, the guardian ad litem suggested that the court might benefit from "a more detailed mental health evaluation" performed by a psychologist rather than a psychiatrist, see id. at 232; see also id. at 217. The court did not stay its resolution of the custody issue to await such an evaluation.

4

including concerns with plaintiff's mental health, "ability to process information," and decisionmaking capacity; evidence suggesting that while under plaintiff's primary custody, M.F.C. had exhibited "a serious lack [of] social development and educational development"; and the court's impression that Clark was more "focused and . . . determined for [M.F.C.] to achieve a greater social functionality and . . . [a] better educational achievement." Defs.' Memo. Ex. A [Dkt. No. 10-1] 222-30; see also id. at 233 (discussing plaintiff's "mental health issues," including diagnoses of "major depression[,] anxiety disorder and attention deficit disorder").

The division of marital property, and in particular the couple's home, which was valued at approximately $950,000, became a second hotly contested issue during the trial. See Compl. 7. The court heard testimony about how the home was financed, costs incurred over the years to improve the property, the couple's income levels, and the 2008 gift deed, which Poe claimed unambiguously manifested Clark's intent to transform the home into marital property under state-law precedent.[10] The court made a series of factual findings—for example, that Clark's income was $70,000 and plaintiff's $20,000, that the marital residence was Clark's sole property before the marriage, that Clark (or his family) was responsible for the down payment and several improvements made to the home, and that "[t]he gift deed of 2008 is unambiguous and shows the gift as of the date of that deed"—but deferred a final decision on equitable distribution until the next day. Defs.' Memo. Ex. A [Dkt. No. 10-1] 233-35. Specifically, the court gave Poe "an opportunity to review the Brandenburg calculations"[11] and dispute them the

---

[10] Poe directed the court to Utsch v. Utsch, 581 S.E.2d 507 (Va. 2003), in which the Virginia Supreme Court held that a gift deed transferring title of the husband's formerly separately owned residence to himself and his wife as tenants by the entirety "was unambiguous on its face, both for the purpose of retitling and [for] proof of donative intent," and accordingly "parol evidence surrounding its execution was not admissible." Id. at 507-08.

[11] Originally developed in Brandenburg v. Brandenburg, 617 S.W.2d 871 (Ky. Ct. App. 1981), what is now known as the Brandenburg formula is a method of "apportion[ing] the marital and

5

following day, if necessary. Id. at 234-35 ("If there's an objection to [the calculation], I'd like to know what it is. Otherwise you can just agree to what the number is."). When Poe asked for a clarification with respect to the marital home, arguing that "the case law is pretty clear," the court responded, "I'll let you be heard on that tomorrow." Id. at 236; see also id. at 238 ("So [tomorrow] I'll hear the parties on the issue of the division of the property, based upon the court's finding on the deed of gift. I'll also give the parties an opportunity to discuss the division of the marital home, considering the contributions that have been made prior to the marriage."). The court also urged the parties to see if they could resolve the issues on their own, stating that there was "no reason why [they] shouldn't be able" to "agree on that equity division." Id. at 240. The court then recessed for the day.

Plaintiff alleges she spoke to Poe immediately after the court had recessed to inform him that in light of the court's custody ruling, Clark had graciously offered her the chance to spend the following day with M.F.C. even though it was his turn under the pendente lite order. She asked Poe whether "she had to be at Court the next day as she would be with the minor child." Compl. 4. Poe told her that her presence was unnecessary "given that there was no more testimony to be heard." Id. On that advice, plaintiff decided not to attend the third day of trial, believing that all that was left was for Poe to "argue the issue of the impact of the gift deed on the property division and terms of spousal support." Id.

---

non-marital components of hybrid property"—that is, "[w]hen marital property and separate property are commingled by contributing one category of property to another." Hart v. Hart, 497 S.E.2d 496, 504-05 & n.3 (Va. Ct. App. 1998) (quoting Va. Code Ann. § 20-107.3(A)(3)(d)). Although the Brandenburg formula "is an acceptable method of tracing and determining the value of the marital and separate property components of hybrid property," id. at 505, it is not the only permissible method, and indeed in some instances can "yield an unfair result," Keeling v. Keeling, 624 S.E.2d 687, 690 (Va. Ct. App. 2006).

6

The next day (July 10, 2015), Poe and Clark's counsel, Ronald L. Hiss ("Hiss"), announced to the court that they had enjoyed "the most productive 15 minutes of th[e] entire two[-]year odyssey" of divorce proceedings the previous evening, Pl.'s Opp'n Ex. 13 [Dkt. No. 26-4] 3, informing the court that the parties had amicably resolved "[a]ll the numbers" and that "[t]here w[ould] be no legal argument on the part of" either attorney, id. Hiss and Poe presented to the court a draft consent order stating that Clark would buy out plaintiff's interest in the home for $95,611.50—essentially 10% of its market value—with a $17,500 down payment and monthly payments of approximately $1,300 for five years thereafter. See Compl. Ex. IV [Dkt. No. 1-4] (initial consent order); Defs.' Memo. Ex. B [Dkt. No. 10-2] 7-8 (incorporating those terms into the final divorce decree). The agreement also resolved other outstanding issues related to the divorce: It called for plaintiff to receive 50% of Clark's retirement account in an estimated amount of $18,000 and allowed her to keep a 2009 Honda CR-V that was titled in Clark's name. Clark and plaintiff would have six months to agree on a division of all marital furnishings and, in the event of disagreement, could "reopen this matter and by notice present the issues to the Court." Clark would be obligated to pay plaintiff $667 per month, for a period of ten years, in spousal support, and plaintiff would be obligated to pay Clark $412 per month in child support until M.F.C. no longer qualified.[12] See Defs.' Memo. Ex. B [Dkt. No. 10-2] 8-14.

After the attorneys had announced the agreement, the court noticed that plaintiff was not in attendance and expressed concerns about her absence, asking Poe whether plaintiff was "aware of all of these terms"—to which Poe cryptically responded, "She gave me authority,

---

[12] Under Virginia law, the support obligation continues until the child's eighteenth birthday and remains in effect "for any child over the age of 18 who is (i) a full-time high school student, (ii) not self-supporting, and (iii) living in the home of the party seeking or receiving child support until such child reaches the age of 19 or graduates from high school, whichever first occurs." Va. Code Ann. § 20-124.2(C).

yes." Pl.'s Opp'n Ex. 13 [Dkt. No. 26-4] 9. The court stated that although the parties were not strictly required to attend, he "hope[d] it's not the wrong signal." Id. at 10. Poe responded, "I don't believe it is, Your Honor." Id. Based on that representation, the court entered the consent order Hiss and Poe had prepared. Id.

Plaintiff claims she was not aware of any agreement, had not authorized any settlement on those terms, and was surprised to learn from Clark that the matter had been settled. Two days after he had represented to the court that his client had consented to the terms in the consent order, Poe emailed plaintiff with "the financial details" of the settlement, stating that he had "tried to call [her] after court on [July 10, 2015] but wasn't able to reach [her]." Pl.'s Opp'n Ex. 6 [Dkt. No. 25-6]. Plaintiff responded that same day:

> Mike, This is not acceptable to me and I believe [t]hat I am better off having the Judge decide!! I authorized you to try to get me more spousal support for a shorter time and how that came to this I do not understand. You say the guideline is $660 for spousal but we were asking for $2,200 and you didn't think that was unlikely or unreasonable . . . . We have an Order that the house was to be sold[13] and my name is on the Gift Deed, what is going on! The market value was to be $950,000. I was married for EIGHT YEARS and have my name on the title and you say that I am only entitled to 10% of the house! I am extremely upset. I gave up my job, no one disputes I supported my husband or raised my son! What did you argue were my non-monetary contributions? What about my husband's negative non-monetary contributions[;] he legally deserted us.[14] Even if you say that I am only

---

[13] A pendente lite order entered by the court in October 2014 required Clark to buy out plaintiff's interest in the marital home "on mutually acceptable terms on or before 1/15/15" and, in the event such terms could not be reached, established that "the property shall be placed on the market immediately and sold." Pl.'s Opp'n Ex. 2 [Dkt. No. 25-2] 8. Plaintiff alleges that sometime in March 2015, Poe moved on her behalf for an order requiring Clark to show cause why the property had not been placed on the market. See Pl.'s Opp'n Ex. 3 [Dkt. No. 25-3]. It is unclear what, if anything, resulted from that motion.

[14] Under Virginia law, "[a]ny spouse who without cause deserts or willfully neglects or refuses or fails to provide for the support and maintenance of his or her spouse, and any parent who deserts or willfully neglects or refuses or fails to provide for the support and maintenance of his or her child under the age of eighteen years of age, . . . the spouse, child or children being then and there in necessitous circumstances, shall be guilty of a misdemeanor." Va. Code Ann. § 20-61. Willful desertion or abandonment is also a ground for what is known as "absolute" divorce, or divorce "a vinculo matrimonii," under Virginia law. Id. § 20-91(A)(6).

entitled to 50% of the equity since my name was put on the title then it still does NOT come out to 10%. . . . I can't believe this!

Compl. Ex. IV [Dkt. No. 1-4]. The same day, she sent a similar email to Clark with a copy to Poe and the guardian ad litem:

My lawyer just sent me details on what he said was the agreement. I did not authorize or have knowledge of these terms. I only knew about the spousal support argument and was willing to take more money over a shorter time but I DO NOT approve the agreement and have let my attorney know the same. We were married for eight years and I stayed home with [M.F.C.] as a baby and my name is on the Gift Deed and you only think that I am entitled to 10% of the market value! I don't have words to describe how this makes me feel. Better Judge Fiore decide the division [because] it couldn't be WORSE for me!

Id.; see also Pl.'s Opp'n Ex. 14 [Dkt. No. 26-5] (additional emails between Poe and plaintiff).

Plaintiff asked Poe to call chambers immediately and inform Judge Fiore "that there was no settlement." Compl. 5. He refused. Id. Plaintiff also protests that Poe failed to object to any of the provisions of the settlement agreement on the record and failed to assist her in noticing an appeal of the entry of the consent order, arguing that Poe's actions effectively deprived her of the chance to seek appellate review of any issues relating to spousal support or equitable distribution. See id. at 6.

Poe ultimately agreed to file a motion for reconsideration on plaintiff's behalf, and a hearing on that motion was held before Judge Fiore on September 11, 2015. Poe asked the court to reconsider the amount of child support owed, arguing that the court's prior finding that plaintiff's income was $20,000 was unjustified in light of the evidence. Pl.'s Opp'n Ex. 6 [Dkt. No. 25-6]. He also argued that Clark's income should have been "at least $100,000 per year"

---

The complaint alleges that plaintiff urged Poe to argue desertion throughout the divorce proceedings, claiming that she and M.F.C. had suffered "economic and emotional distress" as a result of Clark's abandonment. Compl. 8. Plaintiff claims that Poe "intentionally disregarded" her direction, which in turn "weakened [her] case and proximately caused [her] economic and emotional damages." Id. at 8-9.

instead of the $70,000 found by the court; that Clark should have been ordered to pay "at least $1,500 per month" in spousal support given plaintiff's "dire" financial situation; and that the court should reconsider its findings "as to [Clark's] separate contributions made to the marital residence." Id. The court rejected each of those arguments. Id. Poe then yielded the podium to plaintiff, who addressed the court on her own behalf:

> MS. CLARK: . . . [W]hat I need to tell you, Your Honor, is that although I did agree to—I did want my lawyer to settle my case the best way he could, I was not made aware in advance of the buy out provisions or any of the specific terms. . . .

> So I would ask that, as I was not aware of any of these particular terms and did not agree to them . . . and this has been my first opportunity before the court to tell the court this matter, I believe it should be addressed and I should not . . . be held to an agreement with terms I did not even know about until the weekend after everything was done.

> THE COURT: All right. So what are you asking the court to do with regard to the marital home?

> MS. CLARK: . . . I'm asking Your Honor to consider me leaving my employment, and me being the primary care for my child for those years, as a significant non-monetary contribution.

> And with regard to the marital house: I relied upon the marital house. I had given up my career. I had no retirement. . . .

> . . . It was supposed to be our house; I relied on that. Had I known that it was just going to be something that he would misinform the court about at trial, I'd—

> THE COURT: All right. Well, the court needed to adjudicate the equitable distribution, which, of course, included the marital home. And the court considered all the necessary elements that were presented in the record. And I see no reason why the court's finding and order shall be altered at this time.

> Are there any other issues to be addressed?

> MS. CLARK: Well, yes. I didn't know the terms of the consent order.

> THE COURT: I'm sorry, ma'am?

> MS. CLARK: I didn't know the terms of the order.

> THE COURT: Okay. Well the order was submitted to the court by your counsel.

All right. Any other issues, besides the marital residence, to address?

MS. CLARK: Well, yes. Because specifically, Your Honor, in the transcript you asked if the specific terms of the agreement had been made known to me. And they were not. So that was a relevant question.

THE COURT: All right. Okay, anything further?

Id. The court did not express any interest in exploring the issue further—when plaintiff attempted to speak toward the end of the hearing, Judge Fiore responded, "You may speak through your counsel," id.—but vacated the existing consent decree after finding that Poe and Hiss disagreed about one of its terms, instructing the parties to submit a corrected version in one week. Id.; see Pl.'s Opp'n Ex. 7 [Dkt. No. 25-7] (finding that the decree prepared and submitted by Poe and Hiss had been "sufficiently questioned as to accuracy" so as to merit vacatur).

Hiss and Poe made one change to the final divorce decree after the September 11 hearing, removing from the decree a statement that plaintiff had "agree[d]" to its spousal support provisions and substituting a note that "the fixed spousal support amount and duration [were reached] as a stipulation between counsel." Req. to Respond to Defs.' Br. in Supp. of Their Mot. to Dismiss Ex. II [Dkt. No. 28-2]. Although plaintiff continued to insist that the slate be wiped clean so that she could participate in the negotiations, Hiss sent a letter to Poe expressly stating that "there w[ould] be no renegotiating in this matter." Id. Ultimately, the final divorce decree entered by the court on December 1, 2015 contained the same provisions to which plaintiff had been objecting since July. See Defs.' Memo. Ex. B [Dkt. No. 10-2]. Nothing indicates that the court arrived at these terms through an independent analysis; rather, plaintiff alleges that the court believed it was issuing a decree that reflected the parties' (or at least the lawyers') amicable resolution of the issues.

After the final divorce decree was entered, plaintiff hired a new attorney in hopes of suing Poe and the Law Office to recover damages stemming from the way Poe had handled the

divorce proceedings. The attorney apparently advised plaintiff not to file suit and not to contact the state bar. Nonetheless, in March 2017, plaintiff submitted a formal complaint against Poe to the state bar. See Pl.'s Opp'n Ex. 8 [Dkt. No. 25-8]; see also id. Ex. 9 [Dkt. No. 26] (laying out the reasons for the complaint). That complaint was unsuccessful. See Pl.'s Opp'n 5.

## B. Procedural History

The complaint filed in this court is divided into six factually distinct chapters that are misleadingly labeled "causes of action," each of which involves a different course of conduct by Poe—and each of which (plaintiff alleges) gives rise to a variety of claims in tort and contract for which defendants are liable.[15] First is Poe's decision to "settle[] plaintiff[']s case without her knowledge or consent." Compl. 2.[16] Second is Poe's decision not to argue statutory desertion under section 20-91(A)(6) of the Virginia Code. Id. at 7-9.[17] Third is Poe's decision not to submit into evidence during the custody-related show cause hearing videos plaintiff had taken of M.F.C. before scheduled visitation times with his father. Id. at 9-10.[18] Fourth is Poe's failure to assist plaintiff with obtaining a psychiatric or psychological evaluation ahead of the final custody

---

[15] Some of the statements in the complaint—including, for instance, that "[d]efendants failed to properly object to evidence presented at trial by . . . Clark or to cross-examine in a zealous manner," Compl. 7, or that defendants had "no plan or strategy, no thorough analysis of precedent or relevant statutes," id. at 8—are so devoid of specific factual allegations that they cannot be construed to give rise to independent legal claims at all.

[16] The complaint alleges that this decision gives rise to claims for legal malpractice, breach of contract, breach of fiduciary duties, loss of chance, fraud, and intentional infliction of emotional distress. See id. at 2.

[17] The complaint alleges that this decision gives rise to claims for legal malpractice, breach of contract, and breach of fiduciary duties. See id. at 7.

[18] The complaint alleges that this decision gives rise to claims for legal malpractice, breach of contract, and breach of fiduciary duties. See id. at 9.

12

determination. Id. at 10-13.[19] Fifth is Poe's failure to include in the consent order a provision guaranteeing that spousal support would continue even after remarriage. Id. at 13-14.[20] And sixth is Poe's failure to include specific terms providing for division of all marital property in the consent order. Id. at 14-15.[21] Altogether, plaintiff seeks $1.5 million in compensatory and punitive damages, "plus an award of costs, interest, and such other relief that the Court may deem appropriate." Id. at 16.

## II. ANALYSIS

Defendants' motion to dismiss argues that plaintiff's complaint suffers from fatal flaws. Specifically, they argue that plaintiff's tort claims are precluded as a matter of state law and are time barred in any event, and that her legal malpractice claims amount to little more than abstract disagreements with Poe's strategic legal choices. Defendants are correct that most of the complaint cannot survive their Rule 12(b)(6) motion; however, the complaint states a plausible claim for legal malpractice stemming from Poe's decision to settle the case without securing plaintiff's consent, thereby failing to advance viable arguments on her behalf and to preserve her right to appeal. Accordingly, defendants' motion will be granted in part and denied in part.

### A. **Standard of Review**

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a

---

[19] The complaint alleges that this failure gives rise to claims for legal malpractice, breach of contract, breach of fiduciary duties, intentional and negligent infliction of emotional distress, and fraud. See id. at 10.

[20] The complaint alleges that this failure gives rise to claims for legal malpractice, negligence, breach of contract, and breach of fiduciary duties. See id. at 13.

[21] The complaint alleges that this failure gives rise to claims for legal malpractice, negligence, breach of contract, and breach of fiduciary duties. See id. at 14.

13

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 570). The Court must "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor," Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), but only to the extent those allegations pertain to facts rather than legal conclusions, Iqbal, 556 U.S. at 678-79.

Pro se pleadings are "to be liberally construed" and "must be held to less stringent standards than formal pleadings drafted by lawyers." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (internal quotation marks and citation omitted). Nonetheless, this liberal-construction principle is "not . . . without limits," Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985), and a pro se complaint must contain "more than labels and conclusions," Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (quoting Twombly, 550 U.S. at 555). See also Suggs v. M&T Bank, 230 F. Supp. 3d 458, 461 (E.D. Va. 2017) ("Courts do not need to discern the unexpressed intent of the [pro se] plaintiff or to conjure up issues on the plaintiff's behalf.").

## B. State Tort Law Claims

The complaint alleges that in the course of representing plaintiff throughout her divorce proceedings, Poe committed several state-law torts for which he and the Law Office are liable.

14

Plaintiff argues that these torts—which include negligence,[22] breach of fiduciary duty,[23] fraud,[24]

fraud upon the court,[25] loss of chance,[26] and intentional and negligent infliction of emotional

---

[22] "The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff." Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc., 824 S.E.2d 55, 62 (Va. 2006). Negligence actions in Virginia are governed by a two-year statute of limitations, and the cause of action accrues at the time of injury. Tohotcheu v. Harris Teeter, Inc., No. 1:11-cv-767, 2011 WL 5873074, at *4 (E.D. Va. Nov. 22, 2011) (citing Va. Code Ann. § 8.01-243).

[23] "The elements of a claim for breach of fiduciary duty are (1) a fiduciary duty, (2) breach, and (3) damages resulting from the breach." Informatics Applications Grp., Inc. v. Shkolnikov, 836 F. Supp. 2d 400, 424 (E.D. Va. 2011). Such actions are subject to a two-year statute of limitations that "accrues on the date of the breach, not the date of discovery." Goldstein v. Malcolm G. Fries & Assocs., Inc., 72 F. Supp. 2d 620, 625-26 (E.D. Va. 1999).

[24] "A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." Van Deusen v. Snead, 441 S.E.2d 207, 209 (Va. 1994) (citation omitted). Fraud actions are also governed by a two-year statute of limitations, with the cause of action accruing "when the fraud 'is discovered or by the exercise of due diligence reasonably should have been discovered.'" Mullins v. Wells Fargo Bank, N.A., No. 3:16-cv-841, 2017 WL 1202656, at *6 (E.D. Va. Mar. 30, 2017) (quoting Va. Code Ann. §§ 8.01-243, -249).

[25] There is no recognized cause of action for "fraud upon the court" under Virginia law. Rather, a state statute authorizes courts to set aside a judgment or decree upon a showing of "fraud on the court." Va. Code Ann. § 8.01-428(A); see also Jennings v. Jennings, 495 S.E.2d 544, 545-46 (Va. Ct. App. 1998) (observing that parties seeking to set aside a court's decree for "fraud upon the court" must demonstrate such fraud by "clear and convincing evidence"). Any motion for relief from a judgment based on such fraud must be made "within two years from the date of the judgment." Va. Code Ann. § 8.01-428(A). Plaintiff has not asked this Court to set aside the final divorce decree entered in December 2015.

[26] The loss-of-chance doctrine provides that "[w]hen a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant destroyed it, he is answerable." Irby v. Richmond Pediatric Assocs., Inc., No. LR-4601-1, 1989 WL 646370, at *2 (Va. Cir. Ct. Aug. 31, 1989) (quoting Hicks v. United States, 368 F.2d 626, 632 (4th Cir. 1966)). The doctrine "is not a separate cause of . . . action," Kennedy v. Wheeler, No. LX-142-3, 1998 WL 972142, at *1 (Va. Cir. Ct. Mar. 19, 1998), but rather relates to questions of proximate causation and evidence of damages in wrongful death cases, see Straus v. McDonald, No. 222439, 2005 WL 832168, at *2-3 (Va. Cir. Ct. Mar. 4, 2005). As the Supreme Court of Virginia has recognized, the doctrine has limited applicability "outside the context of medical

distress[27]—are "independent" of her legal malpractice claim. Pl.'s Opp'n 7. Defendants respond

that these claims are precluded under Virginia law in light of plaintiff's legal malpractice claims

and thus must be dismissed.

Plaintiff's claims in tort are precluded as a matter of Virginia law. The relationship

between plaintiff and defendants was contractual in nature: She hired them to perform legal

services related to her divorce proceedings, and a written retainer agreement governed that

representation. By virtue of that relationship, defendants, as legal professionals, owed plaintiff

certain duties of care. See O'Connell v. Bean, 556 S.E.2d 741, 743 (Va. 2002) ("Implicit in a

professional's contract of employment is the professional's duty to exercise the care of those

ordinarily skilled in the business and to exercise a reasonable degree of care, skill, and dispatch

in carrying out the business for which he is employed." (internal quotation marks and citations

omitted)). Although breaches of those duties of care are formally torts, the duties themselves

---

malpractice cases," Wagoner v. Commonwealth, 770 S.E.2d 479, 484 n.3 (Va. 2015), and
certainly has no place here.

[27] To state a claim for negligent infliction of emotional distress under Virginia law, a plaintiff
must allege "(1) physical injury (2) proximately caused (3) by negligent conduct (4) wantonly
inflicted by defendants (5) upon plaintiff." Guerrero v. Deane, No. 1:09-cv-1313, 2010 WL
670089, at *16 (E.D. Va. Feb. 19, 2010); see Hughes v. Moore, 197 S.E.2d 214, 219 (Va. 1973)
("[W]here conduct is merely negligent, not willful, wanton or vindictive, and physical impact is
lacking, there can be no recovery for emotional disturbance alone.").

To prevail under a theory of intentional infliction of emotional distress—a tort that "is not
favored in the law, because there are inherent problems in proving a claim alleging injury to the
mind or emotions in the absence of accompanying physical injury"—a plaintiff must show, by
clear and convincing evidence, "that 1) the wrongdoer's conduct was intentional or reckless;
2) the conduct was outrageous or intolerable; 3) there was a causal connection between the
wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress
was severe." Supervalu, Inc. v. Johnson, 666 S.E.2d 335, 343 (Va. 2008) (internal quotation
marks and citation omitted).

Both of these causes of action—like "every action for personal injuries, whatever the theory of
recovery," Va. Code Ann. § 8.01-243(A)—are governed by a two-year statute of limitations and
accrue as of "the date the injury is sustained," id. § 8.01-230.

16

"arise under contract law," Hewlette v. Hovis, 318 F. Supp. 2d 332, 335-36 (E.D. Va. 2004),

and any malpractice claims stemming from them are funneled into breach-of-contract actions,

see Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 293-94 (Va. 2007). To be sure, "a single

act or occurrence can, in certain circumstances, support causes of action both for breach of

contract and for breach of a duty arising in tort"—but only where the "duty tortiously or

negligently breached [is] a common law duty, not one existing between the parties solely by

virtue of the contract." Augusta Mut., 645 S.E.2d at 293-94 (quoting Foreign Mission Bd. of

the S. Baptist Convention v. Wade, 409 S.E.2d 144, 148 (Va. 1991)). Contrary to plaintiff's

argument that she is seeking relief from someone who just "happens to be an attorney," Pl.'s

Opp'n 7,[28] the only duties of care implicated by the complaint stem from defendants'

professional obligations to her under the retainer agreement, and any alleged violations of

those duties must be analyzed through the lens of a malpractice action.[29] Accordingly, any

---

[28] In her opposition, plaintiff repeatedly insists she is relying on "duties [that] exist outside of the attorney-client relationship," Pl.'s Opp'n 7; accord id. at 14, 17-18; however, at no point does she identify what those duties are or from where they spring.

[29] Plaintiff cites Goodstein v. Weinberg, 245 S.E.2d 140 (Va. 1978), for the proposition that "a client may sue [an] attorney in tort for fraud." Pl.'s Opp'n 7. Goodstein recognizes that in "exceptional cases," where an attorney's alleged breach "amounts to an independent, willful tort, . . . the plaintiff has a right to elect whether he will proceed in tort or upon the contract." 245 S.E.2d at 143. This line of precedent is of no help to plaintiff. First, the case on which Goodstein relies for its rule emphasizes that the right to elect applies only where there are "proper allegations of malice, wantonness, or oppression." See Wright v. Everett, 90 S.E.2d 855, 860 (Va. 1956). Although the complaint contains conclusory accusations that defendants behaved with malice, see, e.g., Compl. 2 ("Malice Aforethought"), the factual allegations themselves do not support those accusations. And in any event, the rule to which plaintiff points is one of election—that is, it at most allows a litigant to select either tort or contract as the basis for the suit. Here, plaintiff has attempted to advance claims under both theories. As discussed below, it is no surprise that plaintiff is attempting to thread the needle between the two theories: Her malpractice claims are timely but offer limited damages, whereas her tort claims offer the possibility of additional damages but are untimely.

separately pleaded tort claims are duplicative of plaintiff's legal malpractice claim and must be dismissed.[30]

Plaintiff's tort claims also fail for the independent reason that they are time barred. Based on the allegations in her complaint, plaintiff was aware of every one of the actions she claims was tortious—including Poe's decision to settle the case without her consent, his refusal to present favorable evidence and arguments during the proceedings, his unwillingness to help plaintiff secure a psychiatric evaluation before the trial, and his decision not to include certain provisions in the consent order—by no later than mid-July 2015. As defendants point out, Defs.' Memo. 9, the latest date plaintiff's tort claims could be said to accrue would be December 1, 2015, the date of entry of the final decree, see Defs.' Memo. Ex. B [Dkt. No. 10-2] 15. But she did not file this lawsuit until late November 2018, nearly three years later and nearly one year after the two-year limitations period had expired, which renders these claims untimely.[31]

---

[30] One consequence of this decision is a necessary limitation on the types of damages plaintiff may seek to recover. See, e.g., Smith v. McLaughlin, 769 S.E.2d 7, 19 (Va. 2015) ("[T]he contractual nature of the cause of action defines the recoverable damages so that 'punitive damages may not be awarded' in a legal malpractice claim 'in the absence of an independent, willful tort giving rise to such damages.'" (quoting O'Connell v. Bean, 556 S.E.2d 741, 743 (Va. 2002)); Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 156 (Va. 2009) ("As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained." (quoting Kamlar Corp. v. Haley, 299 S.E.2d 514, 517 (Va. 1983)).

[31] In plaintiff's opposition to the motion to dismiss, she argues that the complaint also pleaded "a claim for tortious conversion of property." Pl.'s Opp'n 15; see id. at 17, 23 (arguing that defendants committed conversion by "assuming control over . . . her interest in the marital home . . . and selling it to [Clark]"). "Under Virginia law, the tort of conversion constitutes 'any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.'" Microstrategy, Inc. v. Netsolve, Inc., 368 F. Supp. 2d 533, 536 (E.D. Va. 2005) (alterations in original) (footnote omitted) (quoting United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 905 (Va. 1994)). Because conversion "involves an injury to property, not to a person," it is subject to a five-year statute of limitations, Dunn v. City of Williamsburg, No. 7123, 1995 WL 17016539, at *5 (Va. Cir. Ct. Jan. 31, 1995) (citing Bader v.

Plaintiff's only response to defendants' statute-of-limitations argument is that "a jury could find that [she] did exercise due diligence and that the statute of limitations should be tolled," and she claims that this district has denied motions to dismiss on similar grounds in the past. Pl.'s Opp'n 1 (citing McPike v. Zero-Gravity Holdings, Inc., 280 F. Supp. 3d 800 (E.D. Va. 2017)). Plaintiff is incorrect. For one thing, although the statute of limitations, as an affirmative defense, is sometimes not fit for resolution at the Rule 12(b)(6) stage, dismissal is proper where "the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Chisolm v. T.J.X. Cos., 286 F. Supp. 2d 736, 739 (E.D. Va. 2003) (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996)); see McPike, 280 F. Supp. 3d at 807 ("[A] statute of limitations question . . . may be resolved on a threshold motion to dismiss . . . if all the facts necessary for resolution of the motion appear on the face of the complaint or are otherwise indisputable."). Here, the complaint clearly alleges that the injuries occurred, and that plaintiff was aware of those injuries, more than two years before she filed suit. Moreover, there

Cent. Fidelity Bank, 427 S.E.2d 184, 186 (Va. 1993)), and thus plaintiff argues that at least this tort claim is not time barred.

There are two issues with this argument. First, although her 17-page complaint does in one instance mention "common law conversion—duty not to sell the property of others," Compl. 2, plaintiff did not identify conversion as a distinct cause of action in any of her counts or headings and did not otherwise give notice to defendants that she was asserting a claim for conversion. Unsurprisingly, defendants' motion to dismiss recognized that plaintiff had advanced claims for "fraud, breach of fiduciary duty, . . . negligence, loss of chance, and negligent/intentional infliction of emotional distress," Defs.' Memo. 7, but did not identify conversion as one of her claims. See Defs.' Reply Br. in Supp. of Their Mot. to Dismiss [Dkt. No. 27] 4-5 (characterizing the conversion claim as "newly articulated"). "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184-85 (4th Cir. 2013). Second, even if plaintiff's complaint is generously read to have alleged a conversion claim, that claim would still be barred. The gist of the conversion claim is that Poe exceeded the scope of his authority as her agent in signing the consent order on her behalf. Thus, it is inseparable from her legal malpractice claim—which is also governed by a five-year statute of limitations, and which is addressed below.

19

is no general principle that "due diligence" justifies tolling a statute of limitations.[32] McPike, on which plaintiff relies, addressed only the narrow rule under Virginia law that for certain actions involving misrepresentation or fraud, the cause of action is deemed to accrue when the injury "is discovered or by the exercise of due diligence reasonably should have been discovered." See 280 F. Supp. 3d at 806-08 (citing Va. Code Ann. § 8.01-249(A)). That rule does not reach most of plaintiff's tort claims and does not save her fraud claims in any event because—according to her own allegations—she had already "discovered" each of the defects identified in her complaint more than two years before the complaint was filed. Accordingly, plaintiff's argument is unavailing, and her common-law tort claims will be dismissed.[33]

## C. Malpractice Claims

Under Virginia law, "[a] cause of action for legal malpractice has three separate elements: 1) the existence of an attorney-client relationship creating a duty; 2) a breach of that duty by the attorney; and 3) damages that were proximately caused by the attorney's breach of duty." Williams v. Joynes, 677 S.E.2d 261, 264 (Va. 2009). Legal malpractice actions often "involve[] a 'case within the case,'" in that the plaintiff must present sufficient evidence with respect to the subject of the underlying legal representation "to convince the trier of fact in the malpractice case that, in the absence of the attorney's alleged negligence, the plaintiff would

---

[32] The conditions that may toll a statute of limitations are set out in section 8.01-229 of the Virginia Code. No part of that section applies here. Plaintiff has not alleged, for example, that defendants intentionally misled her in order "to obstruct the filing of an action," Va. Code Ann. § 8.01-229(D); see also Schmidt v. Household Finance Corp., II, 661 S.E.2d 834, 840 (Va. 2008) (discussing the principle of equitable tolling applied in federal court "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass" (quoting Irwin v. Dep't of Veterans Affairs, 489 U.S. 89, 96 (1990))), or that she was incapacitated during the relevant period, Va. Code Ann. § 8.01-229(A)(2)(b).

[33] Because plaintiff's complaint is divided into factual chapters rather than by cause of action, it is not possible to identify specific counts that must be dismissed.

20

have prevailed"—or at least obtained a measurably better result—"in the underlying action." Id.; see also Jones v. Link, 493 F. Supp. 3d 765, 769 (E.D. Va. 2007) ("[N]egligence is actionable only upon a determination that the underlying claim would have been resolved differently but for the attorney's negligence." (citation omitted) (emphasis added)).

Plaintiff identifies discrete actions or omissions by Poe that she claims give rise to malpractice liability. Each is addressed in turn.[34]

### 1. Settlement Without Plaintiff's Consent

In her own words, the "central issue" or "crux" of this lawsuit is plaintiff's claim that Poe settled her case without her consent, saddling her with an unfavorable marital property division and depriving her of any right to appeal. Pl.'s Opp'n 24. At this stage of the litigation, the Court expresses no views as to whether this claim will ultimately prevail. All that is presently required is to determine whether the complaint states a claim for legal malpractice that is plausible on its face. Because it does, defendants' motion to dismiss will be denied as to this allegation.

An agent (here, Poe) may take actions that are binding on the principal (plaintiff) in only a limited number of ways. First, the agent may act with "actual authority"—that is, where "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act," Restatement (Third) of Agency § 2.01 (Am. Law Inst. 2005)—which may be actual or implied, see id. § 2.02. Second, the agent may act with "apparent authority," which binds a principal to a third party "when a third party reasonably

---

[34] "[A]lthough legal malpractice actions sound in tort, it is the contract that gives rise to the duty," and accordingly "[t]he statute of limitations for legal malpractice actions is the same as those for breach of contract," Shipman v. Kruck, 593 S.E.2d 319, 322 (Va. 2004)—three years for oral agreements and (as relevant here) five years for written contracts, Va. Code Ann. § 8.01-246(2), (4). Accordingly, plaintiff's legal malpractice claims, unlike her independently pleaded tort claims, are not time barred.

believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Id. § 2.03. Third, an action taken by a putative agent without actual or apparent authority may nonetheless be binding on the principal if the principal subsequently ratifies the action, see id. § 4.01, which "retroactively creates the effects of actual authority," id. § 4.02(1). At least as alleged in plaintiff's complaint, none of the foregoing categories is in play. She alleges that she did not give Poe actual authority to settle the case on those specific terms, or more generally on any terms he felt were appropriate, without at least reviewing the material elements of any possible settlement with her.[35]  There are no allegations that plaintiff held Poe out as possessing blanket authority to settle the case on her behalf, and Virginia law "makes clear that an attorney, simply by reason of his or her employment, does not have [apparent] authority to compromise his or her client's claim," and that "[t]he authority of the attorney to bind his client cannot be proved by his or her declarations, acts, or conduct alone," Alper v. Wiley, No. 40366, 2010 WL 11020184, at *2 (Va. Cir. Ct. Sept. 17, 2010).  And far from retroactively ratifying Poe's decision, plaintiff's immediate objection to the settlement makes clear that she rejected Poe's actions in the strongest terms.  For these reasons, the complaint plausibly alleges that Poe settled the case without having authority to do so.

Defendants do not dispute that an attorney's unilateral decision to settle a case on the client's behalf without the client's consent can give rise to a claim for legal malpractice.  Instead, they argue that plaintiff's claim is fatally flawed because she cannot show that any more

---

[35] Several of the documents attached to the complaint and the parties' memoranda make clear that plaintiff did give Poe some sort of an instruction to try to settle the case or secure favorable terms, for instance by obtaining a higher amount of spousal support over a shorter number of years.  But assuming plaintiff's allegations to be true and drawing all reasonable inferences in her favor, the complaint alleges that Poe had received neither express nor implied consent to agree to only 10% of the estimated value of the marital home.

22

favorable resolution of the issues related to her divorce was possible, and even if she could, Poe's decisions would nonetheless be protected from scrutiny by what defendants refer to as the "attorney judgment" rule. Neither argument is convincing at the pleading stage.

Defendants argue that no more favorable resolution of the marital property division was possible. But as plaintiffs' allegations and the attached documents from the state court record indicate, Poe argued on multiple occasions that Virginia law clearly supported plaintiff's right to a higher percentage of the marital home in light of the 2008 gift deed than would be provided under a traditional Brandenburg calculation. See id.; see also id. at 214-15 (asking for 50% of the equity in the marital property and pointing the court to Utsch v. Utsch, 581 S.E.2d 507 (Va. 2003)).[36] By agreeing to the settlement, Poe limited plaintiff's recovery to no more than 10% of the equity in the marital home.[37] As such, plaintiff has plausibly alleged that Poe's decision to settle the case without her consent and for a lower amount than what she may have been able to obtain was the proximate and but-for cause of pecuniary damages for which defendants may be liable, and accordingly this malpractice claim will not be dismissed.[38]

---

[36] At trial, Judge Fiore heard testimony from Clark that he had no bona fide intent to convey a one-half interest in the property in 2008 and that he signed the gift deed without realizing what he was doing. See, e.g., Defs.' Memo. Ex. A [Dkt. No. 10-1] 137-38, 148-49. In response, Poe argued that under Utsch, Clark's donative intent was unambiguous from the face of the deed, and accordingly parol evidence related to the formation of the deed should have been deemed inadmissible. See id. at 149-50, 214-15.

Defendants also argue that Judge Fiore had already ruled that the division would be based on the Brandenburg formula. Not so. See Defs.' Memo. Ex. A [Dkt. No. 10-1] 236, 240.

[37] Defendants suggest that the only question relevant to the causation analysis is whether Clark would have agreed to a different division. See, e.g., Defs.' Memo. 14. But that was not the only option because if the parties could not agree on a settlement, the court would have had to resolve outstanding issues, and either party could have appealed the court's decision.

[38] In their reply, defendants argued that the court's vacatur of the existing consent decree in September 2015 ruptures any causal connection between the original consent order and the final divorce decree, thereby depriving plaintiff of the ability to show causation. This argument is unavailing because Judge Fiore made clear that the vacatur was limited to a narrow issue

23

### 2. Failure to Argue Desertion

What plaintiff describes as the Second Cause of Action relates to Poe's failure or refusal to argue that Clark had legally deserted her and M.F.C. Compl. 7-8. She claims that although she highlighted the "economic and emotional distress" she and the child experienced as a result of that abandonment, see, e.g., Compl. Ex. VI [Dkt. No. 1-6], Poe "intentionally disregarded" her direction to "strengthen" the case by presenting evidence or arguments on that point. See Compl. at 8-9 ("As Statutory Desertion is a misdemeanor in the Commonwealth it was material to the case . . . ."); see also id. at 8 ("Even a lay person [sic] can see that the pleading of Desertion would have had a significant impact on Plaintiff's case from the outset . . . .").

Under Virginia law, willful desertion is one of several grounds for what is known as a divorce "a vinculo matrimonii"—that is, from the bond of matrimony. Va. Code Ann. § 20-91(A). Evidence of abandonment or neglect for over 30 days is deemed to be prima facie evidence of willful desertion. See id. § 20-81. Although plaintiff alleges that she pointed Poe to these provisions in a September 2014 email she attached to her complaint, Compl. Ex. VI [Dkt. No. 1-6], Poe's alleged failure to refer to these provisions had no effect on the divorce because the court concluded that a divorce a vinculo matrimonii was appropriate for the independent reason that Clark and plaintiff "ha[d] lived separate and apart without any cohabitation and without interruption for one year," Va. Code Ann. § 20-91(A)(9)(a). See Defs.' Memo. Ex. B [Dkt. No. 10-2] 3 ("Plaintiff is entitled to a divorce pursuant to § 20-91(9) . . . .").

Plaintiff also claims that Poe's failure to argue facts relating to desertion caused her "damages in the distribution of property and in the Courts' [sic] custody decision which

separate from plaintiff's allegations in this suit, stating that no further legal argument on the issues related to the divorce would be permitted and that plaintiff would remain bound by the agreement reached by her counsel. See Pl.'s Opp'n Ex. 6 [Dkt. No. 25-6].

24

determined child support due to Defendants' negligence and emotional distress," Compl. 8-9—
that is, that she would have received more and would have had to pay less if Judge Fiore had
heard more evidence related to Clark's alleged desertion.

Defendants have demonstrated that this legal malpractice claim is not plausible on its
face. Even assuming the truth of all allegations in plaintiff's complaint, it is far from clear that
Poe breached any standard of care he owed to plaintiff in failing to argue abandonment. Because
the couple qualified for an absolute divorce on other grounds, it was unnecessary to argue
desertion for purposes of section 20-91(A) of the Virginia Code, and the divorce proceeding was
obviously not an appropriate forum to adjudicate plaintiff's charge that Clark had committed the
misdemeanor offense of statutory desertion in violation of section 20-61. With respect to other
issues such as custody and child support, Poe did refer to Clark's desertion in objecting to the
court's July 2015 custody and visitation order. Pl.'s Opp'n Ex. 5 [Dkt. No. 25-5]. To be sure,
plaintiff alleges, and the documents attached to her complaint do not contradict, that Poe did not
cross-examine Clark on his alleged desertion and did not otherwise present evidence related to
that desertion to the court, at least during the second day of the July 2015 trial. But an attorney's
decision as to whether to advance a specific argument or conduct a cross-examination is
inextricably bound up with discretionary matters of strategy and tone. Emphasizing evidence to
trigger a statutory presumption of willful abandonment, for instance, could conceivably convince
a court to treat the allegedly abandoned spouse more favorably, but it might also have opened the
door for Clark to focus on plaintiff's behavior as a reason for his conduct. Because emphasizing
evidence or arguments related to desertion implicated potential risks as well as benefits, Poe's
choices are entitled to protection under the attorney judgment rule, which protects an attorney's
reasonable, even if erroneous, resolution of a strategic dilemma.

Further, even if Poe's choice not to present additional evidence related to the alleged desertion were assumed to be a breach of the duty of care he owed to his client, plaintiff's claim would still fail to satisfy the causation requirement. The distribution of marital property about which she primarily complains was a result of the consent order Poe negotiated and signed on her behalf. Because the court had no opportunity to perform an equitable balancing in light of the parties' apparent settlement, additional evidence as to desertion would have had no effect. To the extent there is any actionable misconduct related to the division of property, it is already subsumed within the settlement-without-consent claim discussed above. And nothing in the complaint indicates that evidence related to desertion would have had any appreciable effect on the court's determination of which parent was better suited to have primary physical custody of M.F.C.—a fact underscored by the court's frank assessment of both parents and his serious concerns with plaintiff's stability and ability to assist with the child's development—or of how much child support would be required. Accordingly, the complaint fails to allege a plausible legal malpractice claim with respect to the arguments related to desertion.

### 3. Failure to Present Video Evidence at Show Cause Hearing

Next, plaintiff protests that although she took multiple videos of M.F.C.'s "tantrums" ahead of scheduled visitation times with his father, videos which (she claims) contradicts Clark's videos "mak[ing] it look like [plaintiff] was keeping [M.F.C.] from his father," Poe failed to submit these videos into evidence during a January 2015 show cause hearing. Compl. 9. As a result, she claims that Judge Fiore "s[aw] only one side of the story" and consequently ordered her to undergo an expensive psychiatric evaluation. Id. at 9-10.

Even assuming that the complaint accurately describes the videos at issue, the trial record shows that Judge Fiore repeatedly stressed the importance of M.F.C.'s maintaining a positive relationship with both parents and heard testimony from the guardian ad litem indicating that

26

plaintiff was failing to exert sufficient control over the child's sometimes volatile emotions.
Given that testimony, plaintiff's videos could just as easily have supported the view that plaintiff
was not helping to preserve M.F.C.'s relationship with her estranged husband, preferring instead
to videotape her son's tantrums as ammunition for a future custody battle. A reasonable attorney
could make the strategic decision not to risk provoking that reaction, and such a decision is
protected under the attorney judgment rule.

Additionally, there is a causal chasm between the harm plaintiff alleges (the cost of
having to secure a psychological evaluation) and the malpractice she identifies (Poe's refusal to
object or present contradictory evidence at the show cause hearing). Nothing in the complaint
indicates that Judge Fiore ordered plaintiff to undergo the evaluation because of what he saw in
Clark's video or that plaintiff's videos would have produced a different result. Plaintiff had been
seeing a psychiatrist for years, and the guardian ad litem suggested that mental health
information was necessary to decide custody and visitation issues. It was an inevitability that
plaintiff's mental health would become an issue in the divorce proceedings. And although
plaintiff alleges that the evidence at the show cause hearing resulted in her being "found in
Contempt of Court," she does not claim that her videos would have squarely contradicted Clark's
argument that she was not complying with the court's pendente lite order. For these reasons, this
aspect of plaintiff's complaint is legally and factually deficient and will be dismissed.

### 4. Lack of Assistance in Securing a Psychiatric Evaluation

What plaintiff terms the Fourth Cause of Action relates to the psychiatric evaluation she
was ordered to undergo. Plaintiff alleges she was "eager" to secure the evaluation but was "very
concerned about how to go about it," both because her insurance did not cover such an
evaluation and because she was unsure what exactly the evaluation would require. Compl. 10.
Plaintiff alleges that she repeatedly asked Poe to call Judge Fiore and/or his clerk to ask what

27

tests were necessary and whether there was a way to have the court or Clark split some or all of the cost, but that Poe refused to approach the court. Id. at 10-11. Plaintiff further alleges that although she obtained and submitted a psychiatric report in advance of the divorce trial, the report was somehow incomplete, and she suggests that a different report could have produced a different custody ruling. See id. at 12 ("Why couldn't Atty. Poe have made one simple phone call and then Plaintiff would've had the correct report on time for Court and Custody would have gone differently?" (emphasis omitted)).

This claim runs aground on the causation requirement, as plaintiff cannot adequately trace defendants' conduct to any harms she suffered. The documents submitted by the parties show that Judge Fiore did not fault plaintiff for any delay or deficiencies with respect to the psychiatric report she submitted. To the contrary, although Judge Fiore observed that the report did not "provide . . . all of the information that's probably out there," he expressly found that it contained "certainly enough information . . . to reach the conclusions" on custody. Defs.' Memo. Ex. A [Dkt. No. 10-1] 222. The custody determination to which plaintiff objects[39] was based on a host of factors, including not only the psychiatric report but also her conduct during the proceedings, her "rambling" and "evasive" testimony at trial, the recommendations of the guardian ad litem, and evidence about M.F.C.'s development while under plaintiff's primary care. See id. at 222-24. Nothing in the complaint indicates what effect a different, or earlier submitted, evaluation might have had, and the court made clear that any doubts about "why or how [plaintiff's] mental state is interfering or could interfere in the future" would not affect the

---

[39] Plaintiff claims she is entitled to damages in the amount of the total child support she was ordered to pay Clark because "child support depends on . . . custody." Compl. 12. She does not argue that anything related to the psychiatric evaluation affected the specific amount of child support she was ordered to pay.

determination that awarding physical custody to Clark would be in M.F.C.'s best interests. See id. at 224-25. In short, the complaint does not allege facts indicating any plausible connection between the court's custody determination and Poe's handling of the mental health evaluation, and accordingly this aspect of the complaint will be dismissed.

### 5. Failure to Include a Provision for Spousal Support to Continue After Marriage

Under Virginia law, "[u]nless otherwise provided by stipulation or contract, spousal support and maintenance shall terminate upon . . . remarriage of the spouse receiving support." Va. Code Ann. § 20-109(D). The consent order, and the final decree incorporating that order's terms, did not include a provision guaranteeing the continuation of spousal support after remarriage. After plaintiff remarried in April 2017, the judge granted Clark's petition to terminate spousal support.[40] Plaintiff alleges that Poe's failure to include the spousal support continuation provision caused her to "suffer economic harm and emotional distress through the loss of much[-]needed spousal support." Compl. 13-14.

As defendants correctly argue, this claim is purely speculative. Just because a provision could have benefitted plaintiff does not mean that Poe was necessarily required to try to include it in a proposed settlement. Settlement negotiations involve an open-ended, exploratory process requiring attorneys to make difficult, discretionary decisions about which issues to press in an ever-changing, path-dependent environment. Further, whether a certain issue should have been pressed depends not only on the facts of each case, but also on the prevailing practices in the

---

[40] Plaintiff also suggests that defendants may be liable to her because Clark has sued her to recover the support payments he made between April 2017, when she remarried, and December 2017, when the judge granted his petition for termination of spousal support. Compl. 14. Under Virginia law, upon her remarriage, plaintiff had "an affirmative duty to notify [her former husband] immediately," and Clark no longer bore any duty to pay. See Va. Code Ann. § 20-109(D). That plaintiff may have received spousal support payments to which she was not entitled does not enable her to seek recovery from her former attorney or his firm.

relevant subject area and geography. This is precisely the type of circumstance for which the breathing space afforded by the "attorney judgment" principle is so vital.

Likewise, defendants point out that even assuming Poe breached his professional duties to plaintiff by not pressing for a provision guaranteeing continuation of spousal support after remarriage, plaintiff's claim still falters because of the causation requirement. Plaintiff was not entitled to demand a continuation provision as a matter of right; to the contrary, and as the statute makes clear, spousal support is presumptively terminated upon remarriage and continues only where the parties reach a contrary agreement, which means that Poe would have had to secure the continuation provision as part of his negotiations with opposing counsel. Absolutely nothing in the complaint indicates even a plausible chance that Clark or his attorney would have accepted such a provision, and the allegation that Clark is pursuing a rebate strongly indicates that he would not have agreed to such a term. Accordingly, plaintiff has failed to state a plausible claim that the spousal support provision issue was the proximate or but-for cause of any harm she suffered, and this legal malpractice claim will be dismissed.

### 6. Failure to Specify a Division of Marital Property

Finally, the complaint alleges that despite plaintiff's frequent "stress[ing of] the need to specifically divide the marital property inside the marital home" in light of Clark's "malicious nature," Poe failed to include such specific provisions in the settlement agreement he negotiated. Compl. 15. Instead, the agreement provided that the parties would endeavor to divide the property and, if an agreement could not be reached within six months, they could "reopen th[e] matter and by notice present the issues to the Court." See id.; Defs.' Memo. Ex. B [Dkt. No. 10-2] 9. Plaintiff alleges that these issues remain unresolved three years later and that she has suffered harm in the form of having to repurchase basic household items.

This final portion of the complaint fails to state a viable claim. An attorney is not liable for malpractice simply because he made a mistake or refused to follow his client's wishes. To prevail, the client must show that but for the attorney's negligent acts, she would have obtained a better result. Plaintiff's complaint does not plead facts plausibly indicating proximate causation between her alleged injuries and Poe's actions. Indeed, plaintiff's own allegations suggest that Clark would never have agreed to a settlement specifically guaranteeing plaintiff a 50/50 split of all household items, and Poe of course could not have demanded any pieces of property unilaterally. Because attorneys do not act as guarantors responsible for their clients' counterparties' decisions whether to settle issues amicably,[41] there is no colorable claim for legal malpractice with respect to the division of marital property.

## III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss will be DENIED as to only the legal malpractice claim based on Poe's alleged decision to agree to a settlement without having secured plaintiff's consent, and GRANTED in all other respects, by an appropriate Order to be issued with this Memorandum Opinion.

Entered this __11th__ day of April, 2019.

/s/ _____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

---

[41] The result would be different if the settlement Poe negotiated had purported to forfeit plaintiff's right to any and all items in the former couple's marital household. Were that the case, plaintiff could have claimed that Poe's actions had caused her economic harm in the amount of replacing the items to which she would have been due. But that is not what the settlement agreement provided.